UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------X
VIRGINIA DESIO,

                       Plaintiff,

           -against-

BHAKAR SINGH[1], TERRENCE DUNCAN,
ALASANA DUMBUYA, LISA MERRITT-SMITH,
NEW HOPE COMMUNITY INC., and
DOES 1 TO 100, inclusive,

                      Defendants.
-----------------------------------------------------------X

**OPINION AND ORDER**

19 Civ. 3954 (JCM)

      Plaintiff Virginia DeSio ("Plaintiff" or "DeSio") brings this action against her former employer, New Hope Community Inc. ("New Hope"), and supervisor, Alasana Dumbuya ("Dumbuya") (collectively, "Defendants"), for violating the Americans with Disabilities Act ("ADA"), the Age Discrimination in Employment Act ("ADEA"), the Family Medical Leave Act ("FMLA") and the New York State Human Rights Law ("NYSHRL"). (Docket No. 1-1) ("Complaint"). Before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking to dismiss Plaintiff's complaint ("Complaint") in its entirety.[2] (Docket No. 57). Plaintiff opposed the motion, (Docket No. 62) ("Pl. Br."), and Defendants replied, (Docket No. 66) ("Def. Reply"). For the reasons that follow, Defendants' motion is granted in part and denied in part.

---

[1] Defendants Bhakar Singh, Terrence Duncan and Lisa Merritt-Smith were dismissed from this action pursuant to the parties' stipulation, which was so ordered by the undersigned on January 25, 2021. (Docket No. 56).

[2] This action is before the Court for all purposes on the consent of the parties, pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Docket No. 12).

## I. BACKGROUND

### A.  Procedural Background

On March 4, 2019, Plaintiff commenced this action against Defendants in Supreme Court, County of Sullivan, alleging age and disability discrimination, FMLA and NYSHRL retaliation, and hostile work environment stemming from her employment and termination from New Hope. (Def. 56.1[3] ¶ 50).  Defendants removed this action to federal court on May 2, 2019. (Docket No. 1; Def. 56.1 ¶ 51).  Defendants now move for summary judgment dismissing the Complaint. (Docket No. 57).  Defendants' motion is accompanied by a memorandum of law, (Docket No. 58) ("Def. Br."), a statement of facts pursuant to Local Civil Rule 56.1, the affidavit of New Hope's corporate representative, Lisa Merritt-Smith ("Merritt-Smith"), (Docket No. 60) ("Merritt-Smith Aff."), and supporting exhibits, (Docket Nos. 59-1–59-23).  Plaintiff filed a memorandum of law in opposition to the motion, (Docket No. 62), which is accompanied by a counterstatement of facts pursuant to Local Civil Rule 56.1, (Docket No. 65), Plaintiff's declaration, (Docket No. 64) ("DeSio Decl."), and supporting exhibits, (Docket Nos. 62-1–62-35).  Defendants filed a reply memorandum of law. (Docket No. 66).

### B.  Factual Background

The following facts are gathered from the parties' 56.1 statements, the exhibits attached to the parties' submissions, and sworn statements by the parties in support of their contentions. The facts are construed in the light most favorable to the non-moving party. *See Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 30 (2d Cir. 2018).

New Hope is a not-for-profit organization that provides residential, employment, educational and health services to persons within the Sullivan County, New York area with

---

[3] Refers to Defendants' statement of facts submitted pursuant to Local Civil Rule 56.1. (Docket No. 61).

intellectual and developmental disabilities. (Def. 56.1 ¶¶ 1–2).  New Hope employs

approximately 603 people, most of whom work in the residential services program, which

provides "group housing and day support services" to disabled individuals. (*Id.* ¶ 3).

Plaintiff was born in July 1964 and is a high school graduate. (DeSio Dep.[4] at 67:15–19,

58:21–22).  Before joining New Hope, Plaintiff worked for several facilities in the tri-state area

providing health services to disabled individuals. (*Id.* at 69:17–71:7).  Plaintiff was hired by New

Hope on January 8, 1998 as an Assistant House Manager for one of New Hope's residential

programs. (Def. 56.1 ¶ 4; Docket No. 59-1).  Plaintiff was promoted to House Manager on June

4, 2000, (Docket No. 59-2 at 2), and then to Program Director on July 8, 2001, (Docket No. 59-2

at 1).  As Program Director, Plaintiff's job responsibilities included supervising, evaluating,

training, hiring and firing staff, ensuring compliance with state and local regulations, verifying

that paperwork was correctly and timely submitted, and assuming "on-call" responsibilities.

(Docket No. 62-4).  On September 17, 2013, Plaintiff's title changed to Residential Billing

Coordinator, (Docket No. 62-5 at 3), and her salary was decreased, (Docket No. 62-11 at 5).

Despite this nominal change, Plaintiff's responsibilities remained generally the same. (*See*

Docket Nos. 62-4; 62-5).  On June 1, 2015, Plaintiff's title was changed to Residential

Coordinator ("RC") and her previous salary was reinstated. (Docket Nos. 62-11 at 5–6; 62-7).

Her responsibilities were consistent with her prior two positions. (*See* Docket Nos. 62-4; 62-5;

62-7; DeSio Dep. at 75:1–4).  As an RC, Plaintiff oversaw between 3 to 18 residential programs,

colloquially referred to as "homes." (DeSio Dep. at 75:10–12, 77:17–78:5).  Each of New

Hope's homes is staffed with a House Manager, an Assistant House Manager, multiple Senior

Direct Support Professionals ("SDSP") and several Direct Support Professionals ("DSP").

---

[4] Refers to the transcript of the deposition of Virginia DeSio taken on January 14, 2020. (Docket No. 76).

(Dumbuya Dep.[5] at 41:21–42:12).  Plaintiff described her role as supporting the House Managers and staff at each home and maintaining a positive quality of life for the individuals living in the homes. (DeSio Dep. at 75:12–16).

Between 1999 and 2013, Plaintiff received thirteen performance evaluations. (Docket No. 62-2).  Plaintiff's performance "met" or was "above" expectations in each of her evaluations. (*Id.*).  Plaintiff's performance was not evaluated after 2013. (*See id.*).  Plaintiff's "Employee Overview" indicates that in 2006 she failed to attend a mandatory meeting. (*Id.*).  In 2010, Plaintiff received a written warning for disclosing an employee's personal information. (*Id.*).  In 2018, Plaintiff was honored with a "20 Year Award" for her dedication to New Hope. (Docket No. 62-9).

In or around late 2016, Plaintiff and Dumbuya worked together as RCs under the supervision of Terrence Duncan ("Duncan"). (Dumbuya Dep. at 35:19–21).  At this time, they were "peers" who "worked very well together," and "help[ed] each other." (*Id.*; DeSio Dep. at 129:21–23).  In July 2017, Dumbuya was promoted to Senior Residential Coordinator, a position that Duncan created to help him manage the RCs. (Duncan Dep.[6] at 24:2–4; Dumbuya Dep. at 18:22–24).  Dumbuya became Plaintiff's direct supervisor. (Duncan Dep. at 18:15–19).  In early 2018, Bhakar Singh ("Singh") was hired by New Hope as Vice President of Strategic Transformation and Programs. (DeSio Dep. at 129:25–130:8; Singh Dep.[7] at 38:20–23).  Plaintiff testified that shortly after Singh's arrival, in approximately April 2018, Dumbuya and Duncan began treating her differently. (DeSio Dep. at 129:19–130:3, 131:12–15).  Karen Barnes

---

[5] Refers to the transcript of the deposition of Alasana Dumbuya taken on January 30, 2020. (Docket No. 67).

[6] Refers to the transcript of the deposition of Terrence Duncan taken on January 21, 2020. (Docket No. 75).

[7] Refers to the transcript of the deposition of Bhakar Singh taken on February 5, 2020. (Docket No. 68).

("Barnes"), who shared an office with Plaintiff, affirmed that she "noticed a drastic change in [Dumbuya's] attitude for the worse [toward Plaintiff] after April 2018." (Docket No. 62-35 ¶ 4 ("Barnes Aff.")).

Duncan and Dumbuya oversaw weekly RC meetings at 10:00 a.m. on Wednesday mornings. (Dumbuya Dep. at 69:17–21; DeSio Dep. at 97:3–10). Plaintiff testified that she was not always on time to these meetings. (DeSio Dep. at 97:5–12). On February 14, 2018, Plaintiff was late to the RC meeting because of an ice storm that blocked off several roads. (*Id.* at 158:4–19). Plaintiff told Dumbuya that she would be late and obtained a note from the local highway department concerning the road closures. (*Id.* at 158:20–159:8). Plaintiff alleged that she tried to give this note to Dumbuya, who responded that "he didn't need it." (*Id.* at 160:19–22). Dumbuya did not recall whether Plaintiff was late to the February 14, 2018 meeting or whether Plaintiff tried to give him a note about the road closures. (Dumbuya Dep. at 90:11–23).

## 1. Plaintiff's Rheumatoid Arthritis, Degenerative Joint Disease and Request for an Accommodation

In or around 2013, Plaintiff was diagnosed with rheumatoid arthritis and degenerative joint disease (collectively, "disabilities"), which impact her mobility. (DeSio Dep. at 83:5–25, 84:7–12). Plaintiff's disabilities cause her pain throughout her entire body, and difficulty physically getting out of bed in the morning, "lift[ing] very much," and "get[ting] up again" after sitting for extended periods. (*Id.* at 86:2–23). In general, Plaintiff moves more slowly than she used to. (*See id.*). Plaintiff testified that she informed Duncan of her ailments shortly after she was diagnosed, (*id.* at 90:12–17), which Duncan confirmed, (Duncan Dep. at 119:17–21). Plaintiff testified that in or around late 2017, as her symptoms began to worsen, she informed Dumbuya that "[she] may be slow" and was "going to start slowing down a little bit" due to her

disabilities. (DeSio. Dep. at 92:12–22).  Dumbuya denied knowledge of Plaintiff's disabilities. (Dumbuya Dep. at 80:13–15).

Plaintiff testified that she continued to perform her job despite her impairments, but that it "was very tough" to perform certain functions, such as "takedowns." (DeSio Dep. at 93:25–94:17).  Plaintiff's symptoms worsened over time. (*Id.* at 84:10–11).  She testified that by late 2017, she required an accommodation to come into work later, because her pain was at its worst in the mornings. (*Id.* at 95:22–96:21).  On December 12, 2017, Suleman Bahana, M.D. ("Dr. Bahana") wrote a letter to New Hope explaining that "[d]ue to an arthritic condition, [Plaintiff] may be coming into work at 9:30 AM some days." (Docket No. 62-10).  Plaintiff maintains that she showed this note to Dumbuya, which Dumbuya denies seeing. (DeSio Dep. at 96:19–22; Dumbuya Dep. at 80:13–15).

**2.  Comments About Plaintiff's Mobility**

Plaintiff testified that she struggled to navigate New Hope's residential campus and was often late to meetings because of her disabilities. (*See* DeSio Dep. at 135:2–8).  Plaintiff alleged that when she was late, Dumbuya would tell her that she "need[ed] to speed up," or ask her why she "couldn't get back from the houses on time like another RC." (*Id.* at 135:5–17; DeSio Decl. ¶ 13).  Plaintiff "believe[d] the RC [Dumbuya] was referring to was either Albert White [("White")] or Kushana Watkins [("Watkins")]," both of whom, to Plaintiff's knowledge, did not have disabilities and were younger than her. (DeSio Decl. ¶ 13).  Plaintiff testified that she would tell Dumbuya that "it takes [her] a little bit longer to move around" because of her disabilities, which Dumbuya would ignore. (DeSio Dep. at 135:9–17, 135:18–23).  Plaintiff also testified that Scott Whitehead ("Whitehead"), who worked in the admissions department, (Rion Dep.[8] at

---

[8] Refers to the transcript of the deposition of Erin Rion taken on February 11, 2020. (Docket No. 70).

53:1–24), made comments such as: "boy, you're slowing down" and "I don't see you moving too fast today." (DeSio Dep. at 128:7–25).

### 3. Plaintiff's FMLA Leaves

Plaintiff took FMLA leave twice in 2000 to recover from gastric bypass and gallbladder surgeries. (*Id.* at 99:9–10). In 2009, she was granted intermittent FMLA leave to care for her ailing father. (*Id.* at 98:22–99:4; Def. 56.1 ¶ 6). Plaintiff requested intermittent FMLA leave again in 2013 to take care of her mother. (Def. 56.1 ¶ 7). In or around April 19, 2018, Plaintiff sought to exercise her FMLA rights to take her mother to doctor's appointments. (DeSio Dep. at 100:3–17; Dumbuya Dep. at 85:8–14). Plaintiff alleged that after requesting up to two days off per week to assist her mother, Dumbuya called her into his office and "questioned" her about her need to take FMLA leave when she had remaining sick days. (DeSio Dep. at 99:17–101:2). Dumbuya denied that this meeting occurred and could not recall whether Plaintiff informed him that her mother had health issues. (Dumbuya Dep. at 83:17–84:23). Plaintiff was granted a final FMLA leave from July 2 to August 1, 2018. (Def. 56.1 ¶¶ 8–9). All of Plaintiff's requests for FMLA were decided by New Hope's human resources department. (DeSio Dep. at 101:12–22, 113:7–10). Plaintiff was never denied FMLA leave. (Def. 56.1 ¶ 9).

### 4. Progressive Disciplinary Policy

Merritt-Smith, New Hope's Director of Human Resources, Dumbuya and Duncan testified that New Hope uses a progressive disciplinary policy, which was modified in 2015 when Merritt-Smith started at New Hope. (Merritt-Smith Dep.[9] at 40:10–20; Dumbuya Dep. at 44:14–21; Duncan Dep. at 66:6–11). Pursuant to the modified policy, an employee is given a "written warning 1," followed by a "written warning 2," a "final written warning," and

---

[9] Refers to the transcript of the deposition of Lisa Merritt-Smith taken on February 12, 2020. (Docket No. 72).

ultimately, termination. (*Id.*).  Before 2015, the policy progressed as follows: (1) oral warning; (2) written warning; (3) final written warning; and (4) termination. (Dumbuya Dep. at 164:2–12; *see also* Merritt-Smith Dep. at 24:4–5).  Singh, however, testified that he did not "remember any particular" disciplinary policy and that discipline was "based on whatever [] performance addresses [sic] need to happen." (Singh Dep. at 57:19–23, 58:2–3).

Merritt-Smith testified that a final written warning may be warranted if the employee had "multiple [disciplinary infractions]," a "written warning 2" or a "performance improvement plan[]" in their file. (Merritt-Smith Dep. at 44:5–12).  She testified that it may be appropriate to issue a final written warning in the absence of earlier warnings, if, for example, "someone punched an individual in the face," "as opposed to someone [who] . . . repeatedly came in late." (*Id.* at 43:4–14).  Merritt-Smith explained that Dumbuya was required to discuss the warning with the RC and confer with Duncan before "mov[ing] forward with disciplinary action," and that she typically reviewed warnings before they were issued for, *inter alia*, spelling and grammar. (*Id.* at 50:24–51:8, 51:5–8, 53:2–10).

**5.  Events Leading Up to Plaintiff's Final Written Warning**

Plaintiff was issued a final written warning on June 27, 2018 (the "FWW"). (Docket No. 62-12 at 1).  The parties' descriptions of the events precipitating the FWW diverge considerably and will be discussed in turn.

**i.  102 Dee's Drive and 204 Michael's Court**

Plaintiff and Dumbuya agreed in or around 2015 or 2016, while Dumbuya was still an RC, to swap oversight responsibilities for certain homes.  Dumbuya began supervising 102 Dee's Drive ("102DD") and 204 Michael's Court ("204MC") and in exchange, Plaintiff began overseeing 410 Larry's Way ("410LW") and 306 Stupell Circle ("306SC"). (*See* DeSio Dep. at 155:22–

156:20; Dumbuya Dep. at 32:22–35:11; DeSio Decl. ¶ 3).  Dumbuya testified that Plaintiff

"came to [him] . . . crying" and begged him to take responsibility for 102DD and 204MC.

(Dumbuya Dep. at 34:20–22).  Plaintiff, on the other hand, testified that 102DD and 204MC

were smaller homes than 410LW and 306SC, and that the switch was intended to reduce

Dumbuya's workload. (DeSio Dep. at 156:10–157:6; DeSio Dep. ¶ 3).  It is undisputed that

102DD and 204MC housed nine and eight individuals, respectively, while 410LW and 306SC

each housed twelve individuals. (DeSio Dep. at 156:10–157:6; Dumbuya Dep. at 66:25–67:7).

### ii.  307 Stupell Circle

Dumbuya alleged that Plaintiff struggled to supervise 307 Stupell Circle ("307SC").

(Dumbuya Dep. at 113:2–8, 119:6–15).  Specifically, Dumbuya testified that Plaintiff "cr[ied] in

front of the staff" and made inappropriate comments. (*Id.*).  Dumbuya later testified, however,

that Christina Seti ("Seti"), who worked in New Hope's marketing department, relayed to him

that she was told by a DSP named Sophia that Plaintiff cried at 307SC "after," and because, she

received the FWW. (*Id.* at 114:2–3; 15–18).  Seti complained about Plaintiff's alleged

inappropriate emotionality at 307SC to human resources on August 29, 2018. (Docket No. 59-

11).

### iii.  410 Larry's Way

410LW was described by several former employees as a residence for "senior

individuals" between the ages of 80 and 90 with "no significant mental impairments." (Docket

No. 62-34 ¶ 5 ("Edwards Aff."); Docket No. 62-33 ¶ 5 ("Kehrley Aff."); Docket No. 62-32 ¶ 5

("Ketcham Aff.")).  410LW primarily housed non-violent individuals and as such, "there was no

need for the staff . . . to ever use physical interventions." (Kehrley Aff. ¶ 5).

In or around early 2018, an individual named Justana was transferred to 410LW. (Edwards Aff ¶ 5; Kehrley Aff. ¶ 5; Ketchum Aff. ¶ 5).  At that time, Nick Kehrley ("Kehrley") was the House Manager of 410LW and Marcy Ketcham ("Ketcham") was the Assistant House Manager. (Ketcham Aff. ¶ 3; Kehrley Aff. ¶ 3).  Justana was in her mid-twenties. (Ketcham Aff. ¶ 5).  She was "physically much larger than most of the [410LW] staff." (Kehrley Aff. ¶ 6; *accord* Rion Dep. at 41:19–21).  Justana was described as having "severe psychiatric behavioral issues[,] which [were] evident from her violent conduct." (Ketcham Aff. ¶ 5; Edwards Aff. ¶ 5). Kehrley, Ketcham, Edwards and Rion described how Justana "attacked numerous . . . employees that resided at 410LW." (Ketcham Aff. ¶ 5; *see also* Kehrley Aff. ¶ 6; Edwards Aff. ¶ 5; Rion Dep. at 33:4–6).  Ketcham contended that she "was personally attacked by Justana several times" and that Justana threw objects at her. (Ketcham Aff. ¶ 5).  Edwards averred that Justana attempted to punch her in the face on several occasions. (Edwards Aff. ¶ 5).  Kehrley, Ketcham and Edwards described how the staff and residents feared Justana and demanded her removal from the residence. (Kehrley Aff. ¶ 6; Ketcham Aff. ¶ 5; Edwards Aff. ¶ 5).

**a. May 29, 2018 Training**

On May 29, 2018, Rion led a training session for the 410LW staff, which was "focus[ed] on Justana." (Docket No. 62-16 at 1).  At the training, Rion and two clinicians, Layla Capaci ("Capaci") and Ivory Patterson, practiced "several [strategies for crisis intervention and prevention] techniques (at real speed and high intensity)" with the staff. (Docket No. 62-16 at 1). Edwards testified that none of the staff practiced physical interventions before this training. (Edwards Dep.[10] 31:3–6).  Rion described in a contemporaneous e-mail to Plaintiff, Dumbuya, Duncan and Singh that "[m]ost staff members showed some type of fear, dislike, apprehension,

---

[10] Refers to the transcript of the deposition of Heidi Edwards taken on June 16, 2020. (Docket No. 71).

etc. about working with Justana." (Docket No. 62-16 at 1). Rion described how Plaintiff and her colleagues repeatedly reminded the team of Justana's right to live in 410LW, but "despite [their] best efforts," the staff remained "argumentative" and "came up with an opposing scenario to every piece of advice [given]." (*Id.*). Overall, Rion "found the team to be quite vocal, not particularly polite, very defensive, burnt out, loud, nervous, defeatist, pessimistic, and very scared to work with Justana." (*Id.*).

Dumbuya alleged that Plaintiff acted unprofessionally at this training "by crying in front of the team." (Docket No. 62-12 at 1). Dumbuya averred that four staff members reported Plaintiff's crying to Duncan on June 4, 2018. (*Id.*). Duncan testified that Dumbuya was the one who told him that Plaintiff was crying at the training. (Duncan Dep. at 135:19–21). Duncan could not recall from whom Dumbuya heard that Plaintiff had cried. (*Id.* at 135:22–136:6). Rion, Kehrley, Edwards and Ketcham, all of whom attended the meeting, testified that they did not observe Plaintiff become emotional or cry. (Rion Dep. at 57:7–8; Kehrley Aff. ¶ 9; Edwards Aff. ¶ 6; Ketcham Aff. ¶ 9). Rion testified that Plaintiff raised her voice at the training "to be heard," as the staff was speaking loudly. (Rion Dep. at 57:3–6).

## b. Ketcham's Resignation and Kehrley's Demotion

Ketcham resigned from New Hope in approximately June 2018. (Ketcham Aff. ¶ 3). Ketcham stated that she resigned "main[ly]" because Kehrley "was a poor House Manager," "who took advantage of other people . . . doing his work," and would "sit . . . with his feet up at his desk, bragging about his salary." (*Id.* ¶ 4). She explained that her resignation was also motivated, in part, by Justana's placement in 410LW. (*Id.* ¶ 5).

Shortly after Ketcham resigned, Kehrley was demoted to Assistant House Manager and transferred out of 410LW. (DeSio Dep. at 169:3–4). Plaintiff testified that Kehrley was "failing"

in his position, despite two previous warnings and one-on-one monthly trainings. (*Id.* at 163:5–19).  Plaintiff testified that Duncan sought to fire Kehrley, but that she advocated to demote him instead because of his demonstrated commitment to New Hope. (*Id.* at 168:1–7).

### c.  Compromised Safe

Plaintiff testified that "sometime after 4:00 pm on June 25, 2018," Kim Meekins ("Meekins"), the Assistant House Manager of 410LW who replaced Ketcham, told her that "the safe had been compromised because Nick Kehrley . . . left the combination in an unlocked drawer." (DeSio Decl. ¶ 7; *accord* DeSio Dep. at 169:3–10, 169:20–25).  Plaintiff instructed Meekins to remove the valuables from the safe and lock them in her desk drawer. (DeSio Dep. at 169:11–15).  Plaintiff testified that right after she spoke to Meekins, Dumbuya came into her office to inquire about the safe. (DeSio Decl. ¶ 8; *accord* DeSio Dep. at 170:9–14; *see also* Dumbuya Dep. at 199:17–21).  Plaintiff alleged that immediately thereafter, she left a voice message for Brian McPhillips ("McPhillips"), the director of maintenance. (DeSio. Decl. ¶ 9). Plaintiff followed-up with McPhillips by e-mail at 4:20 p.m. explaining what had occurred. (Docket No. 62-15).

Dumbuya testified that he was told the safe had been compromised and immediately called McPhillips. (Dumbuya Dep. at 199:8–12).  Dumbuya averred that after calling McPhillips, he contacted Plaintiff and "ordered her to call [McPhillips]." (*Id.* at 199:17–20).  However, Dumbuya later corrected his testimony and stated that he did not "order" Plaintiff to call McPhillips, because he had already called him. (*Id.* at 199:22–3).  Dumbuya further alleged that the safe "was open for a while before" it was secured. (*Id.* at 204:11–13).  However, Dumbuya later equivocated and testified that he did not "know how long [the safe] was left open," nor was he "concerned about how long [it was left open]." (*Id.* at 207:20–23).  He testified that "it

doesn't matter if it's [open] for one minute or five minutes . . . it's an issue if it comes to [him]" in the first place. (*Id.* at 206:25–207:3, 207:12–13).  Dumbuya did not investigate who compromised the safe. (*Id.* at 200:16–19).  No valuables were lost in the incident. (*Id.* at 203:14–15).

### iv.  Alleged Disclosure of Confidential Information to Edwards

Dumbuya claimed that on June 15, 2018, Plaintiff told Edwards "that she needs to learn how to complete paperwork because the manager, [Kehrley], [would] not be there long." (Docket No. 62-12 at 1; Dumbuya Dep. at 145:18–21).  Dumbuya testified that Edwards reported the alleged comment to Duncan because it was "inappropriate." (Dumbuya Dep. at 146:14–17).  Edwards, however, affirmed that in approximately June 2018 she was considering applying for the Assistant House Manager position at 410LW, which was held by Ketcham, not Kehrley. (Edwards Aff. ¶ 4).  She discussed her interest in the position with Plaintiff. (Edwards Aff. ¶ 4).  Edwards stated that Plaintiff "encouraged" her to apply, and that they did not "discuss Nick Kehrley's demotion." (*Id.*).  Edwards claimed that she learned about Kehrley's demotion "after he entered" his new role. (*Id.*).  Plaintiff maintained that Edwards expressed interest in Ketcham's position because Ketcham told Edwards that she was resigning. (DeSio Decl. ¶ 5).  Plaintiff insisted that she did not tell Edwards about Kehrley's demotion. (*Id.*).

### v.  Complaints About Plaintiff

Rion testified that various clinicians, including Kerry Valencia ("Valencia"), Antonio Simmons ("Simmons") and Capaci, complained about Plaintiff. (Rion Dep. at 26:15–21, 26:23–27:23).  Specifically, Rion alleged that Valencia told her that on one occasion, Plaintiff upset staff members by crying in front of DSPs when "somebody was dying." (Rion. Dep. at 23:15–19).  Furthermore, Rion testified that she received complaints from Valencia, Capaci and

Simmons that Plaintiff was "too . . . reactive and [became] very focused on little things . . . to the point where they felt like it was harder to do their job[s]." (*Id.* at 26:15–21).  Rion explained that "something very small could happen and [Plaintiff] would act like it was a very, very major issue," by, for instance, "try[ing] to call an emergency meeting." (*Id.* at 26:23–27:2).  Rion could not remember when these complaints were brought to her attention. (*Id.* at 27:12–23).

Furthermore, Dumbuya alleged that Watkins, White, Barnes and Melissa Martinez ("Martinez") complained to him on separate occasions in June 2018 that Plaintiff did not effectively assist them with staffing. (Dumbuya Dep. at 218:19–21, 219:20–21, 220:9–12, 221:13–15, 222:8–14, 223:1–7, 223:9–16).

## 6. Final Written Warning and Performance Improvement Plan

Plaintiff received the FWW on June 27, 2018. (Docket No. 62-12 at 1).  Dumbuya testified that it was his decision to issue the FWW. (Dumbuya Dep. at 94:5–7, 94:23–95:22). Dumbuya received approval from Duncan to issue the FWW, but Duncan did not provide input because he was on vacation at the time. (*Id.* at 95:17–24).  The FWW alleged that Plaintiff: (1) "fail[ed] to provide effective oversight . . . at 102 Dee's Drive and 204 Michael's Court resulting in reassignment of these two homes to a competence [sic] RC;" (2) "failed to recognize team dysfunction early on resulting in significant decline in team morale and teamwork" at 307SC and 410LW; (3) failed to attend weekly residential coordinator meetings and other meetings, which was discussed on February 14, 2018; (4) told Edwards on June 15, 2018, that "she needs to learn how to complete paper work" because Kehrley would "not be there long;" (5) reacted "to an emotionally charged crowd in an unprofessional manner by crying in front of the team" at the May 29, 2018 meeting at 410LW; (6) failed to "bring the 410 Larry['s] Way team together which resulted in . . . [Ketcham] resigning and . . . Kehrley being demoted;" (7) "failed to act

promptly to correct the situation" when a safe combination was compromised at 410LW on June 25, 2018; and (9) failed to "pull" her "own weight." (Docket No. 62-12 at 1).

Plaintiff provided a detailed response to the FWW in an e-mail to human resources on July 12, 2018. (Docket No. 62-14 at 2). Plaintiff stated that she felt that she was "being targeted" because of her disabilities, requesting an accommodation in December 2017, and exercising FMLA rights in April 2018. (*Id.* at 5). Merritt-Smith testified that she did not recall reading Plaintiff's e-mail. (Merritt-Smith Dep. at 130:10). Merritt-Smith replied to the e-mail on July 19, 2018. (Docket No. 62-14 at 11). Merritt-Smith did not discuss Plaintiff's disabilities, age or FMLA leave with Dumbuya or anyone at New Hope in connection with Plaintiff's July 12, 2018 e-mail. (Merritt-Smith Dep. at 134:17–24).

Plaintiff was additionally placed on a performance improvement plan ("PIP") and three-month probationary period. (Docket No. 62-12 at 2). Pursuant to the PIP, Plaintiff was directed to: (1) "[p]rovide effective oversight and support to . . . direct reports;" (2) "[b]uild professional relationships" with staff; (3) improve her organizational skills; (4) address concerns proactively; (5) seek immediate feedback and respond to crisis situations promptly; and (6) attend required meetings. (*Id.*). The PIP warned that "further violation of [the plan] or other agency policy could lead to further disciplinary action up to and including termination." (*Id.*; Def. 56.1 ¶ 30). Plaintiff's caseload was reduced in connection with the PIP, which was scheduled to be implemented on July 6, 2018. (Docket No. 62-12 at 2; Def. 56.1 ¶ 31). However, since Plaintiff took FMLA leave on July 2, 2018, (Def. 56.1 ¶ 33), the PIP began when she returned on August 1, 2018, (*id.* ¶ 34).

**7.  Subsequent Complaints About Plaintiff and Reassignment of 306 Stupell Circle**

On July 2, 2018, Plaintiff requested FMLA leave for anxiety and depression that was triggered by receiving the FWW. (Docket No. 62-17 at 4; DeSio Dep. at 98:7–12).  Plaintiff's request for leave was granted. (DeSio Dep. at 105:16–17).  Plaintiff returned to work on August 1, 2021. (*Id.* at 104:10–11).  On the day of her return, Stacey Anderson ("Anderson"), the House Manager at 306 Stupell Circle ("306SC"), complained that Plaintiff "refuse[d] to help . . . when [they] are down staff or in a crisis," "joked around" inappropriately, "micromanage[d]," and did not attend any meetings in 2018. (Docket No. 59-7).  Anderson described that she felt "targeted" by Plaintiff after she complained about Plaintiff to Duncan. (*Id.*).  Dumbuya testified that Anderson had "ongoing" problems with Plaintiff because Plaintiff "normally doesn't help her with scheduling," "finding coverage" or "the team dynamic." (Dumbuya Dep. at 192:11–15, 193:14–194:10).  Duncan confirmed that Anderson spoke to him about Plaintiff, but he could not recall Anderson's specific grievance. (Duncan Dep. at 238:6–17).  Duncan testified that Anderson told him that she felt targeted by Plaintiff following her complaint. (*Id.* at 237:2–5).

The next day, Dumbuya submitted a letter to human resources memorializing that he and Duncan "let [Plaintiff] [know] that she can no longer [over]see 306 Stupell Circle due to concerns brought up by the manager and the assistant manager" and instructed Plaintiff "to maintain professionalism at all times." (Docket No. 59-8).

**8.  Plaintiff's August 15, 2018 Comment and Termination**

During an August 15, 2018 staff meeting, Plaintiff told a group of co-workers, in sum and substance, that she could not provide coverage after August 31, 2018 because she only had 16 days left at New Hope. (DeSio Decl. ¶ 14).  On August 20, 2018, Plaintiff was terminated. (Docket No. 59-13).  Duncan and Merritt-Smith informed Plaintiff of her termination and

provided her with a termination notice. (Docket No. 59-13; Duncan Dep. at 250:11–23).  The

notice indicated that Plaintiff's termination was the result of "negative" and "retaliatory"

behavior reported to Duncan and Dumbuya from August 1 to 17, 2018. (Docket No. 59-13).

On August 28, 2018, Barnes and Watkins submitted written statements to human

resources describing Plaintiff's August 15, 2018 statement that she only had 16 days left at New

Hope. (Docket Nos. 59-9; 59-10).  On August 29, 2018, Seti documented that she heard from

Sophia that Plaintiff was speaking inappropriately about New Hope during the August 15, 2018

meeting. (Docket No. 59-11).  Plaintiff's termination notice referenced Barnes, Watkins and

Seti's complaints. (Docket No. 59-13).  Barnes later affirmed that "[o]n August 28, 2018, Mr.

Dumbuya called [her] into his office and ordered that [she] write a statement about Ms. DeSio's

comment during the meeting . . ." (Barnes Aff. ¶ 8).  Barnes stated that she felt that Plaintiff was

"not given a chance to improve and was set for failure from the beginning of her performance

improvement plan, if not earlier." (*Id.*).

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby,

Inc.*, 477 U.S. 242, 247-48 (1986).  A genuine dispute of fact "exists for summary judgment

purposes where the evidence is such that a reasonable jury could decide in the non-movant's

favor." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008).  "A fact is material if it might

affect the outcome of the suit under the governing law." *Lindsay v. Ass'n of Prof'l Flight

Attendants*, 581 F.3d 47, 50 (2d Cir. 2009).  In reviewing a motion for summary judgment, the

court must draw all reasonable inferences in favor of the non-moving party. *See Gallo v.*

*Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1223 (2d Cir. 1994).  The Court may not make credibility determinations, weigh the evidence or draw legitimate inferences from the facts. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *See Celotex*, 477 U.S. at 323.  If the movant meets its burden, the burden then shifts to the non-movant to present evidence sufficient to satisfy every element of the claim. *See Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).  Like the movant, the non-movant cannot rest on allegations in the pleadings and must point to specific evidence in the record to carry its burden on summary judgment. *See Celotex*, 477 U.S. at 324.  Summary judgment can neither be defeated by conclusory allegations nor "on the basis of conjecture or surmise," *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 188 (2d Cir. 1992); the non-moving party "must offer some hard evidence showing that its version of the events is not wholly fanciful," *D'Amico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998).  Put differently, the dispute of fact must be "genuine," that is, the record evidence must be such that a reasonable jury could return a verdict for the non-movant. *See Anderson*, 477 U.S. at 248.

Parties moving for and opposing summary judgment in the Southern District of New York must submit short and concise statements of facts supported by admissible evidence. Local Civ. R. 56.1.  The opposing party must specifically controvert the moving party's statement of material facts, or the moving party's facts will be deemed admitted for purposes of summary judgment. *See id.*; *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 418 (2d Cir. 2009). Furthermore, the court "disregards the parties' Local Rule 56.1 statements to the extent that the statements couch legal argument and analysis as fact and offer legal conclusions." *A.B. by Alverez v. United States*, 16CV2554 (LMS), 2019 WL 10302175, at *2 (S.D.N.Y. Apr. 17,

2019); *see also Epstein v. Kemper Ins. Co.*, 210 F. Supp. 2d 308, 314 (S.D.N.Y. 2002)

("Statements in an affidavit or Rule 56.1 statement are inappropriate if they are not based on

personal knowledge, contain inadmissible hearsay, are conclusory or argumentative, or do not

cite to supporting evidence.").

## III. DISCUSSION

The Court notes at the outset that an independent review of the record belies certain

assertions in Defendants' 56.1 statement.  Accordingly, the Court declines to consider the

assertions contained in Defendants' 56.1 statement that are contradicted by the record, not based

on personal knowledge, contain inadmissible hearsay, or are otherwise improper, even if they are

not contested by Plaintiff. *See A.B. by Alverez*, 2019 WL 10302175, at *2.[11]

## A. Plaintiff's Discrimination/Retaliation Claims

Plaintiff brings claims under the ADA, ADEA and NYSHRL for disability and age-based

discrimination, as well as an FMLA retaliation claim arising from her employment and

termination from New Hope.  Plaintiff asserts two theories of discrimination/retaliation.  First,

Plaintiff argues that she was discriminated or retaliated against because of a discrete

characteristic, *i.e.*, her disability, age, *or* exercise of FMLA rights.  "Under this theory, the court

evaluates whether any of the plaintiff's protected characteristics, considered individually, may

---

[11] For instance, paragraph 24 of Defendants' 56.1 statement asserts that "Plaintiff failed in her supervision of 410 Larry['s] Way to such a degree that the House Manager (Nick Kehrley) was demoted and the Assistant House Manager (Marcy Ketcham) resigned." (Def. 56.1 ¶ 24).  Defendants support this proposition by citing to Dumbuya's statement in the FWW that "[Plaintiff] failed to bring the 410 Larry['s] Way team together which resulted in . . . Marcy[] resigning and . . . Nick[] being demoted." (*Id.*; Docket No. 59-5).  This statement is directly contradicted by Ketcham's testimony that she resigned due to Kehrley's poor leadership and Justana's presence in 410LW, as well as Kehrley's Employee Overview, which demonstrates nine disciplinary infractions precipitating his demotion. (Ketcham Aff. ¶¶ 4–5; Docket No. 62-13).  Similarly, Defendants state in paragraph 26 that "Plaintiff failed to take any action with regard to the safe being compromised [at 410LW]." (Def. 56.1 ¶ 26).  Nevertheless, Plaintiff's deposition testimony and a contemporaneous e-mail sent to McPhillips confirm that immediately after learning that the safe was compromised, Plaintiff notified maintenance and instructed Meekins to secure the safe's valuables. (DeSio Dep. at 169:8–24; Docket No. 62-15; *see also* DeSio Decl. ¶ 7).

have motivated the defendants" to discriminate or retaliate against her. *Anderson v. New York City Health and Hosps. Corp.*, 16-CV-1051 (GBD)(KHP), 2020 WL 2866960, at *11 (S.D.N.Y. Mar. 2, 2020).  Second, Plaintiff advances an "intersectional discrimination" theory, in which she asserts that the discrimination and retaliation she experienced was "attributable, at least in part, to the combination" of her status as a disabled, older woman who exercised FMLA rights. *See id*. Courts in this circuit have recognized the viability of a claim at the intersection of two protected characteristics. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 109 (2d Cir. 2010) (recognizing "that a plaintiff's discrimination claims may not be defeated on a motion for summary judgment based merely on the fact that certain members of a protected class are not subject to discrimination, while another subset is discriminated against based on a protected characteristic shared by both subsets."); *Craig v. Yale Univ. School of Medicine*, 838 F. Supp. 2d 4, 9 (D. Conn. 2011) (plaintiff plead sufficient facts to make out a "cognizable . . . 'race plus' claim of discrimination against black males, which can exist even without proof of discrimination against African-American women or against white males.").

Claims brought under the ADA, ADEA, FMLA and NYSHRL are subject to the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*. 411 U.S. 792 (1983).[12] Under this standard, a plaintiff must first establish a *prima facie* case of discrimination or retaliation. *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).  If the plaintiff establishes a *prima facie* case, a rebuttable presumption is raised that the employer unlawfully discriminated or retaliated against the plaintiff, *see Texas Dep't of Comm. Affairs v. Burdine*, 450

---

[12] *See Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (ADA claims are analyzed under the *McDonnell Douglas* framework); *Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 203 (S.D.N.Y. 2009) (FMLA claims are analyzed under *McDonnell Douglas* framework); *Fu v. Consol. Edison Co. of New York, Inc.*, 20-1335, 2021 WL 1342915, at *1 (2d Cir. Apr. 12, 2021) (summary order) (ADEA claims are analyzed under the *McDonnell Douglas* burden shifting framework).

U.S. 248, 254 (1981), and the burden shifts to the defendant to articulate a legitimate reason for

the adverse employment action in question, *see Sista*, 445 F.3d at 169.  If defendant articulates

such a reason, plaintiff "shoulders the burden of showing 'sufficient potential proof for a

reasonable jury to find the proffered legitimate reason merely a pretext' for discrimination" or

retaliation. *Roberts v. Ground Handling, Inc.*, 499 F. Supp. 2d 340, 357 (S.D.N.Y. 2007)

(quoting *Ferraro v. Kellwood Co.*, 440 F.3d 96, 100 (2d Cir. 2006)).  "Although intermediate

evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of

persuading the trier of fact . . . remains at all times with the plaintiff.'" *Reeves*, 530 U.S. at 143

(quoting *Burdine*, 450 U.S. at 256).

## 1. *Prima Facie* Case of Disability-Based Discrimination Under the ADA and NYSHRL

The ADA bars discrimination "against a qualified individual on the basis of disability in

regard to . . . discharge of employees . . . and other terms, conditions, and privileges of

employment. 42 U.S.C. § 12112(a).  The NYSHRL similarly prohibits an employer from

"discharg[ing] from employment [an] individual or [] discriminat[ing] against [an] individual in

compensation or in terms, conditions or privileges of employment," "because of an individual's .

. . disability." N.Y. Exec. L. § 296(1)(a).  To establish a *prima facie* case of disability

discrimination,[13] "a plaintiff must show (a) that [her] employer is subject to the [statute]; (b) that

[s]he is disabled within the meaning of the [statute] or perceived to be so by [her] employer; (c)

that [s]he was otherwise qualified to perform the essential functions of the job with or without

reasonable accommodation; and (d) that [s]he suffered an adverse employment action because of

[her] disability." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 134 (2d Cir. 2008).  The ADA

and NYSHRL require a plaintiff to demonstrate that their disability was the but-for cause of the

---

[13] The same standards govern disability claims brought under the NYSHRL and ADA. *See Graves v. Finch Pruyn & Co.*, 457 F.3d 181, 184 n.3 (2d Cir. 2006).  These claims will therefore be considered together.

adverse action taken against them. *See Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019).  Establishing a *prima facie* case of disability discrimination "is not a demanding burden." *Clark v. Jewish Childcare Ass'n, Inc.*, 96 F. Supp. 3d 237, 248 (S.D.N.Y. 2015) (quoting *Greenway v. Buffalo Hilton Hotel*, 143 F. 3d 47, 52 (2d Cir. 1998)).  For purposes of the instant motion, Defendants do not dispute that Plaintiff was disabled, that New Hope was subject to the ADA and NYSHRL, or that the FWW, PIP and Plaintiff's ultimate termination were adverse employment actions. (Def. Br. at 16).  Thus, at issue here is whether Plaintiff was "otherwise qualified" to work as an RC and whether Plaintiff's disabilities were the but-for cause of the adverse employment actions.

**i.  Qualification**

Defendants argue that Plaintiff "was not qualified for her position because she was not adequately performing her duties as a Residential Coordinator." (Def. Br. at 17).  Plaintiff counters that the relevant question is whether she "possesse[d] the basic skills necessary for performance" of her job. (Pl. Br. at 24) (citing *Slattery v. Swiss Reins. Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001)).  Plaintiff argues that she satisfies this standard because she performed the duties of an RC or its functional equivalent at New Hope for over 15 years and her performance evaluations consistently indicated that she met or exceeded expectations. (*Id.* at 24).

"When evaluating whether a plaintiff alleging discrimination can establish a *prima facie* case, the Second Circuit has instructed that 'the qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that [s]he possesses the basic skills necessary for performance of the job.'" *McDonnell v. Schindler Elevator Corp.*, No. 12–CV–4614 (VEC), 2014 WL 3512772, at *6 (S.D.N.Y. July 16, 2014), *aff'd*, 618 F. App'x 697 (2d Cir. 2015) (quoting *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7*,

691 F.3d 134, 147 (2d Cir. 2012)).  The pertinent query is whether Plaintiff had the requisite skill and experience to work as an RC, with or without a reasonable accommodation. *See Stamney v. NYP Holdings, Inc.*, 358 F. Supp. 2d 317, 323 (S.D.N.Y. 2005).

Before commencing her employ at New Hope, Plaintiff worked at various other facilities that serviced disabled individuals for several years. (DeSio Dep. at 69:17–25).  Thereafter, Plaintiff worked at New Hope for roughly 20 years. (*See* Docket No. 62-2 at 2).  Although her title changed, she performed the duties of an RC, which included conducting audits, ensuring compliance with pertinent state regulations, leading trainings, and hiring and firing employees, for approximately 15 years. (Docket Nos. 62-2, 62-4–62-8).  During her tenure as an RC, all of Plaintiff's performance evaluations indicated that she either met or surpassed New Hope's expectations. (Docket No. 62-2).  Further, the record includes sworn statements from several of Plaintiff's former subordinates attesting to her competence as an RC. (*See* Ketcham Aff. ¶ 9; Edwards Aff. ¶ 7; Barnes Aff. ¶ 9; Kehrley Aff. ¶ 9).  Ketcham described Plaintiff as "an excellent Residential Coordinator" who "always made herself available when . . . needed." (Ketcham Aff. ¶ 9).  Edwards testified that Plaintiff "was an excellent Residential Coordinator," (Edwards Aff. ¶ 7), Barnes testified that Plaintiff "was an excellent employee," (Barnes Aff. ¶ 9), and Kehrley described Plaintiff as a "good Residential Coordinator," (Kehrley Aff. ¶ 9).  In light of the foregoing, Plaintiff satisfies the minimal burden of demonstrating that she was qualified for her job as an RC for purposes of her *prima facie* case.

## ii.  Inference of Discrimination

The parties also dispute whether Plaintiff's disabilities were the but-for cause of the adverse employment actions at issue.  "[I]t is axiomatic that the adverse employment action must take place under circumstances giving rise to an inference of discrimination in order to be

actionable under the ADA." *Flieger v. E. Suffolk BOCES*, 693 F. App'x 14, 17 (2d Cir. 2017) (internal quotations omitted).  Defendants argue that Plaintiff has not demonstrated that the adverse actions were taken because of her disabilities. (Def. Br. at 18).

Plaintiff counters that Dumbuya's repeated remarks about her "speed" indicated discriminatory animus. (Pl. Br. at 26).  Plaintiff testified that it took her longer to move around New Hope's campus because of her disabilities and that when she was late to a meeting or residence, Dumbuya commented that she "need[ed] to speed up," or questioned why she "couldn't get back from the houses on time like another RC." (DeSio Decl. ¶ 13; DeSio Dep. at 135:5–8, 135: 11–17).  Plaintiff believed that the RC to whom Dumbuya was comparing her was either White or Watkins, neither of whom were disabled. (DeSio Decl. ¶ 13).  Plaintiff testified that each time Dumbuya told her to "speed up," she would explain that "it takes [her] a little bit longer to move around" because of her disabilities. (DeSio Dep. at 135:9–17).

"Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision" to take an adverse employment action. *Schreiber v. Worldco, LLC*, 324 F. Supp. 2d 512, 518 (S.D.N.Y. 2004).  When considering whether such a nexus exists, courts in this circuit consider:

> (1) who made the remark (*i.e.*, a decision-maker, a supervisor, or a low-level coworker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (*i.e.*, whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (*i.e.*, whether it was related to the decision-making process).

*Clark*, 96 F. Supp. 3d at 252 (emphasis added) (quoting *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010)).  No one factor is dispositive. *See id.*

First, the remarks were allegedly made by Dumbuya, who was Plaintiff's immediate supervisor and the primary decision-maker with respect to the adverse employment actions taken against her. (Dumbuya Dep. at 94:5–16).  The record demonstrates that Dumbuya single-handedly drafted the FWW because Duncan was on vacation. (*Id.* at 94:5–7, 94:23–95:22).  Dumbuya also believed, but could not recall with certainty, that he drafted Plaintiff's termination notice. (*Id.* at 225:22–226:2).  Dumbuya's role as Plaintiff's supervisor and the primary decision-maker behind the FWW and her termination renders his remarks "more probative of discrimination." *See, e.g.*, *Horwath v. DHD Windows and Doors, LLC*, Civil Action No. 3:18-cv-1422 (CSH), 2020 WL 3316560, at *18 (D. Conn. June 17, 2020).

Second, regarding the timing of the remarks, Plaintiff maintains that Dumbuya consistently commented on the speed with which she navigated New Hope's campus. (*See* DeSio Dep. at 135:12–17).  The record is not clear, however, as to the specific dates on which Dumbuya made such comments.  Nevertheless, Plaintiff and Barnes testified that Plaintiff's relationship with Dumbuya soured in April 2018, after Singh arrived at New Hope. (DeSio Dep. at 129:19–130:8; Barnes Aff. ¶ 4).  Further, the FWW was issued in June 2018 and Plaintiff was terminated in August 2018. (Docket Nos. 62-12, 62-14).  Thus, drawing the facts in the light most favorable to Plaintiff, a jury may conclude that these comments were close enough in time to the adverse employment actions to support the requisite nexus between them. *See Martinez v. Connecticut, State Library*, 817 F. Supp. 2d 28, 42 (D. Conn. 2011).

Third, the Court looks to the content of the remarks.  While Dumbuya's comments do not expressly reference Plaintiff's disabilities, courts in this circuit have found that a remark that alludes to a protected class may support a finding that the remark is probative of discrimination. *See Jacobs v. New York City Dep't of Educ.*, No. 11 Civ. 5058 (MKB), 2018 WL 10125148, at

*10 (E.D.N.Y. Mar. 31, 2018).  Dumbuya's comment that Plaintiff should "speed up" and his criticism that she could not move as quickly as other employees, in conjunction with Plaintiff's allegations that she gave Dumbuya a doctor's note concerning her limited mobility and repeatedly explained to him that she could not "speed up" due to her disabilities, may support a jury finding that Dumbuya's comments demonstrated discriminatory animus. *Cf Horwath*, 2020 WL 3316560, at *19 (finding that supervisor's comment that Plaintiff was not provided sales leads because he was "broken" and "hurt" "evince[d] an animus based on Plaintiff's disability").

Fourth, the Court must evaluate the context in which these comments were made in relation to the adverse employment decisions.  The record does not indicate a "direct link" between Dumbuya's comments and his decision-making process with respect to the FWW or Plaintiff's termination. *Jowers v. Family Dollar Stores, Inc.*, No. 09 Civ. 2620(WHP), 2010 WL 3528978, at *3 (S.D.N.Y. Aug. 16, 2010); *cf Testa v. Carefusion*, No. 14CV5202(JFB)(AKT), 2016 WL 4099113, at *5 (E.D.N.Y. Aug. 2, 2016) (finding that supervisor's "comments were made in the context of the decision-making process, as they were made while discussing plaintiff's job performance and the skills necessary for him to satisfactorily perform in his role"). This factor thus weighs against a finding that Dumbuya's comments were connected to the FWW or Plaintiff's termination.

Nevertheless, the Court finds that a reasonable jury may conclude that a nexus existed between Dumbuya's alleged remarks and the disciplinary actions taken against Plaintiff. *See Schreiber*, 324 F. Supp. 2d at 523.  Crucially, the Court views these comments in light of "other indicia of discrimination" set forth by Plaintiff, specifically, as discussed in detail *infra*, the record evidence casting doubt on the veracity of the reasons given in the FWW concerning the need for disciplinary action, Dumbuya's departure from procedure in issuing the FWW, and the

fact that after nearly 20 years at New Hope, the FWW was issued within six months of Plaintiff

seeking an accommodation for her progressing disabilities. *See infra* Section III(A)(5)(ii)(a).

Accordingly, the Court finds that Plaintiff has established causation for purposes of her *prima*

*facie* case.

**2.  *Prima Facie* Case of Age Discrimination under the ADEA and NYSHRL**

Pursuant to the ADEA and NYSHRL, it is unlawful "for an employer . . . [to]

discriminate against any individual with respect to his compensation, terms, conditions, or

privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); *see also*

N.Y. Exec. L. § 296(1)(a).[14]  Individuals over the age of forty are protected by the foregoing

provisions. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996).  To

establish a *prima facie* case of age discrimination, a plaintiff must show "(1) that she was within

the protected age group[;] (2) that she was qualified for the position[;] (3) that she experienced

adverse employment action[;] and (4) that such action occurred under circumstances giving rise

to an inference of discrimination." *Gorzynski*, 596 F.3d at 107.  Plaintiff must demonstrate that

age was the but-for cause of the adverse actions taken against her. *See id.* at 106.

Plaintiff was born in July 1964 and was 54 years old at the time she received the FWW.

(*See* DeSio Dep. at 58:21–22).  Plaintiff was 55 years old at the time of her termination. (*See id.*).

The parties do not dispute that Plaintiff was in the protected age group, subjected to adverse

---

[14] The NYSHRL provides, in relevant part, that "[i]t shall be an unlawful discriminatory practice . . . [f]or an employer . . . because of an individual's age, . . . to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."  Age discrimination claims brought under the NYSHRL are analyzed pursuant to the same standards as ADEA claims, and as such, the Court will analyze Plaintiff's claims together. *See Abrahamson v. Bd. of Educ. of Wappingers Falls Cent. Sch. Dist.*, 374 F.3d 66, 71 n.2 (2d Cir. 2004).

employment actions, or qualified for purposes of the ADEA.  At issue here is whether Plaintiff's age was the but-for cause of the actions taken against her. (*See* Def. Br. at 26–27).

Defendants aver that Plaintiff has not adduced any evidence of age-based discrimination. (*Id.*).  Defendants also highlight the following facts: (1) all but one of New Hope's RCs are over the age of 40; (2) 204 (over one-third) of New Hope's workforce is over 40; and (3) Martinez, an RC at New Hope, is currently older than Plaintiff was at the time of her termination. (Def. 56.1 ¶¶ 44–46).  Plaintiff contends that age-based discriminatory animus can be inferred from "the irreconcilability of Dumbuya's explanation for why he gave [Plaintiff] a final written warning but believed it was wrong for [Plaintiff] to issue Kehrley a warning or demote him." (Pl. Br. at 27).  Plaintiff argues that a "major" difference between herself and Kehrley, both long-term New Hope employees, is that Kehrley is approximately 15-20 years[15] her junior. (*Id.*; *see also* DeSio Decl. ¶ 12).  Plaintiff does not cite to evidence supporting her argument that Dumbuya treated her and Kehrley differently.

"Where a plaintiff is relying on differences in treatment to establish an inference of discrimination, the plaintiff bears the burden of demonstrating that a putative comparator is similarly situated in all material respects." *Pierre v. Napolitano*, 958 F. Supp. 2d 461, 478 (S.D.N.Y. 2013).  "An employee is similarly situated to co-employees if they were (1) 'subject to the same performance evaluation and discipline standards' and (2) 'engaged in comparable conduct.'" *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000)).  Plaintiff does not assert that she was subject to the same standards or that she engaged in similar conduct as Kehrley. (*See* Pl. Br. at 27).

---

[15] Plaintiff argues in her brief that she is 10-15 years older than Kehrley. (Pl. Br. at 27).  By contrast, in her declaration, Plaintiff states that to the best of her knowledge, she is 15-20 years older than Kehrley. (DeSio Decl. ¶ 12).  As Plaintiff's brief is not evidence, the Court will accept Plaintiff's representation of Kehrley's age in her sworn declaration as true for the limited purpose of adjudicating the instant motion.

Even assuming, *arguendo*, that Plaintiff met her burden of demonstrating that she and Kehrley were proper comparators, such a showing, without more, is insufficient to raise an inference of age-based discrimination in the present case for two reasons. *See O'Hazo v. Bristol-Burlington Health Dist.*, 599 F. Supp. 2d 242, 259 (D. Conn. 2009) (plaintiff's "conclusory statements" that he was subjected to a higher level of scrutiny than similarly situated comparators are insufficient to support an inference of discrimination).

First, Plaintiff has not demonstrated that she was actually treated more harshly by New Hope's leadership than Kehrley.  Plaintiff testified that Duncan sought to fire Kehrley, and that he was only demoted because Plaintiff advocated for him not to be terminated. (DeSio Dep. at 164:2–7).  Additionally, Kehrley received nine formal warnings during his tenure at New Hope. (Docket No. 62-13).  Consequently, the record does not establish that Kehrley was treated with more leniency than Plaintiff.

Second, the Court has scoured the record and finds no support for the argument that Dumbuya's testimony concerning Kehrley demonstrated age-based hostility toward Plaintiff.  In sum and substance, Dumbuya testified that when he was the RC of 410LW, he was not aware of issues with Kehrley's performance as Assistant House Manager. (Dumbuya Dep. at 156:23–157:12).  This testimony is insufficient to form the basis for even a minimal inference that Plaintiff's age was the but-for cause of the actions taken against her.  Consequently, Plaintiff has not established a *prima facie* case of age-based discrimination.  Accordingly, Defendants' motion for summary judgment with respect to Plaintiff's age-based discrimination claims is granted.

### 3. *Prima Facie* Case of FMLA Retaliation

The FMLA entitles eligible employees to 12 weeks of unpaid leave on an annual basis. *See Di Giovanna v. Beth Israel Med. Ctr.*, 651 F. Supp. 2d 193, 196 (S.D.N.Y. 2009). Employers are "prohibited from discriminating against employees . . . who have used FMLA leave." *Id.* at 198 (quoting 29 C.F.R. § 825.220(c)).  To establish a *prima facie* case of FMLA retaliation, plaintiff must show that: "(1) [s]he exercised rights protected under the FMLA; (2) [s]he was qualified for h[er] position; (3) [s]he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent." *Ziccarelli v. NYU Hosps. Ctr.*, No. 15-cv-9307 (JGK), 2021 WL 797668, at *6 (S.D.N.Y. Feb. 27, 2021) (quoting *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004)).  A "plaintiff raises an inference of retaliatory intent if she demonstrates that exercising her rights under the FMLA was used as a 'negative factor' in the defendant's employment actions." *Farooqi v. New York Dep't of Educ.*, No. 19cv3436 (DLC), 2021 WL 1549981, at *4 (S.D.N.Y. Apr. 20, 2021) (quoting *Woods v. START Treatment and Discovery Ctrs., Inc.*, 864 F.3d 158, 169 (2d Cir. 2017)).

It is undisputed that Plaintiff took FMLA leave twice in 2000 to recover from surgeries, and that she was granted intermittent FMLA leave in 2009 and 2013 to care for her parents. (DeSio Dep. at 98:22–99:15–100:17; Def. 56.1 ¶ 7).  In or around April 2018, Plaintiff requested up to two days off per week to take her mother to doctor's appointments. (DeSio Dep. at 100:3–9).  Plaintiff alleges that shortly thereafter, Dumbuya questioned why she was using FMLA leave to care for her mother when she had unused sick days. (*Id.* at 99:17–20).  Plaintiff claims that she told Dumbuya that she was "entitled to FMLA, and [did not] want to get a warning notice" concerning lateness or absences. (*Id.* at 101:6–11).  Plaintiff contends that Dumbuya "rolled his

eyes" in response. (*Id.* at 101:12–21).  Immediately after receiving the FWW on June 27, 2018, Plaintiff took FMLA leave from July 2 to August 1, 2018 to tend to her mental health. (Def. 56.1 ¶ 8).  Plaintiff was terminated from New Hope on August 20, 2018. (Docket No. 62-20).

It is undisputed that Plaintiff exercised her rights under the FMLA and suffered adverse employment actions. (Def. 56.1 ¶¶ 6–8, 27, 42).  Defendants do not contest that Plaintiff was qualified for her job as an RC for purposes of FMLA retaliation. (*See* Def. Br. at 29–30).  Thus, the question before the Court is whether Plaintiff's exercise of FMLA rights was a negative factor in Dumbuya's decision to issue the FWW or terminate her.  Defendants argue that the record is devoid of evidence connecting Plaintiff's exercise of her FMLA rights to adverse actions taken against her. (Def. Br. at 29).  Defendants aver that Plaintiff successfully took FMLA leave throughout her tenure and contend that Dumbuya's questions regarding her request for leave are insufficient to demonstrate a retaliatory intent. (*Id.*).  Defendants highlight that "[o]f the seven other RCs employed by New Hope during and after Plaintiff's employment, five took FMLA leave," four of whom are still employed by New Hope. (Def. Br. at 30).  Defendants maintain that the fifth RC resigned voluntarily. (*Id.*).

Plaintiff argues that the FWW was motivated in part by Dumbuya's dissatisfaction with her April 2018 request. (*See* Pl. Br. at 21–25).  Plaintiff also ostensibly argues that her July 2018 FMLA leave was a factor in New Hope's termination decision. (*See id.*).

Plaintiff can establish a causal connection for purposes of FMLA retaliation "by showing that the protected activity was closely followed in time by the adverse employment action." *Colon v. Fashion Institute of Tech. (State Univ. of New York)*, 983 F. Supp. 2d 277, 287 (S.D.N.Y. 2013) (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons*, 842 F.2d 590, 593 (2d Cir. 1988)).  Plaintiff received the FWW approximately two months after her

alleged conversation with Dumbuya concerning her April 2018 exercise of FMLA rights. (Docket No. 62-12; DeSio Dep. at 99:17–101:2).  Additionally, she was terminated approximately 18 days after she returned from her July FMLA leave. (Docket No. 59-13; Def. 56.1 ¶ 8).  In light of the "minimal" showing required at this stage, a jury may infer based on the timing of Plaintiff's exercises of FMLA rights that they were a "negative factor" in the adverse actions taken against her. *See Reed v. Nike, Inc.*, No. 17 Civ. 7575 (LGS), 2019 WL 2327519, at *6 (S.D.N.Y. May 31, 2019); *see also Donnelly*, 691 F.3d at 138–39 (negative performance evaluation received approximately three weeks after plaintiff returned from FMLA leave, where plaintiff had previously received only positive evaluations, supported inference of retaliatory intent); *Cooper v. New York State Nurses Ass'n*, 847 F. Supp. 437, 448 (E.D.N.Y. 2012) (causation element of FMLA retaliation case was established where the plaintiff was terminated less than two months after returning from FMLA leave).

#### 4.  Legitimate, Non-Discriminatory Reasons for the FWW, PIP and Plaintiff's Termination

Defendants argue that the FWW and PIP were issued, and Plaintiff was ultimately terminated because of her poor performance and "inappropriate behavior." (Def. Br. at 19–23, 27).  Specifically, Defendants allege that Dumbuya issued the FWW because: (1) Plaintiff wrongfully told Edwards that "[Kehrley] would not be in [his] position for long," breaching confidentiality; (2) "failures of staff" occurred under Plaintiff's supervision, *e.g.*, Kectham's resignation and Kehrley's demotion, which evidences "Plaintiff's failures in leadership;" and (3) Plaintiff was unable "to control her emotions in front of her subordinates" on several occasions. (*Id.* at 20–21).  Defendants further argue that Plaintiff's termination was precipitated by: (1) Anderson's complaint about Plaintiff "on [her] *first day* back from [FMLA] leave;" (2) Plaintiff's alleged comment during the August 15, 2018 meeting that she "would not provide

coverage because she would no longer be employed at New Hope by the end of the month;" and (3) Seti's report that she heard from Sophia that Plaintiff was speaking negatively about New Hope. (*Id.* at 22–23) (emphasis in original).  As Defendants' burden at this juncture is one of production, which Defendants have satisfied, the burden shifts to Plaintiff to demonstrate that her termination was in fact motivated by illicit considerations. *See Reeves*, 530 U.S. 133 at 142.

## 5.  Intentional Discrimination

At this stage, the burden lies with Plaintiff "to prove intentional discrimination by a preponderance of the evidence." *Risco v. McHugh*, 868 F. Supp. 2d 75, 99 (S.D.N.Y. 2012). Plaintiff may defeat summary judgment "either by proving that a discriminatory motive, more likely than not, motivated the defendants or by proving both that the reasons given by the defendants are not true and that discrimination is the real reason for the actions." *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000) (internal quotation omitted).  Plaintiff argues that the demonstrable falsity of Dumbuya's reasons for issuing the FWW cast doubt on Dumbuya's purported good faith belief that Plaintiff engaged in misconduct. (Pl. Br. at 11–17, 27–29).  Plaintiff maintains that she would not have been terminated absent the FWW. (*Id.* at 28).  Additionally, Plaintiff avers that discriminatory animus is demonstrated by: (1) Dumbuya's comments regarding her speed; (2) the timing of the adverse employment actions taken against her; and (3) Dumbuya's departure from New Hope's disciplinary policy in issuing the FWW. (Pl. Br. at 26–27).

## i.  Pretext

"Proof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination." *Reeves*, 530 U.S. at 147. The fact finder may "reasonably infer from the falsity" of the employer's explanation that "the employer is dissembling to cover up a discriminatory purpose." *Id.*  Indeed, "once the

employer's justification has been eliminated, discrimination may well be the most likely alternative explanation, especially since the employer is in the best position to put forth the actual reason for its decision." *Id.* at 134. A plaintiff's *prima facie* case, combined with evidence that the employer's purported justification is false, may permit a fact finder to conclude that the employer unlawfully discriminated. *See id.*

### a. Dumbuya's Explanation for Issuing the FWW

Defendants assert that it is irrelevant whether the allegations in the FWW are true, because Dumbuya subjectively believed that Plaintiff violated company policy when he issued the FWW. (Def. Br. at 21; Def. Reply at 13). Plaintiff counters that the FWW lacks corroboration and documentation, levies allegations about events that took place years prior, is vague and subjective, refuses to identify the sources of information or the details of those sources' complaints, and to the extent concrete allegations are included, provides "illogical, inconsistent, [or] contradicted" explanations for such allegations. (Pl. Br. at 17). Plaintiff maintains that each reason stated in the FWW is belied by the record. (Pl. Br. at 11–17). The Court will address each of Plaintiff's arguments in turn.

### 1. 102 Dee's Drive and 204 Michael's Drive

The FWW alleged that Plaintiff violated company policy by failing to "provide effective oversight . . . as a residential coordinator at 102 Dee's Drive and 204 Michael's Court resulting in reassignment of these two homes to a competence [sic] RC." (Docket No. 62-12 at 1). The "competent" RC mentioned in the FWW is Dumbuya. (*See id.*). This allegation references the arrangement in which Plaintiff began overseeing 410LW and 306SC, and Dumbuya began overseeing 102DD and 204MC. *See supra* Section I(B)(5)(i). Plaintiff avers that she switched

housing responsibilities with Dumbuya to reduce his workload. (DeSio Dep. at 156:10–157:6; DeSio Dep. ¶ 3).

It is undisputed that 410LW and 306SC were larger residences than 102DD and 204MC. (DeSio Dep. at 156:10–157:6; Dumbuya Dep. at 66:25–67:7).  Furthermore, Dumbuya's own deposition testimony casts aspersions on his belief that Plaintiff violated company policy with respect to the exchange.  When asked which provision of New Hope's policy was violated by the swap, Dumbuya testified that Plaintiff was "failing" at overseeing 102DD and 204MC "[b]ecause the turnover was high," and "the managers were leaving." (Dumbuya Dep. at 107:3–13).  Nevertheless, Dumbuya testified later in his deposition that he does not "just give warning[s] because [a manager] ha[s] turnover, there has to be more issues." (*Id.* at 124:22–24). Additionally, Dumbuya testified that Kayla Babcock ("Babcock"), a former house manager of 102DD, resigned "[s]ome months" into *his* tenure as 102DD's RC. (*Id.* at 108:10–13).  Dumbuya did not receive a warning or other sanction when Babcock resigned. (*Id.* at 108:22–24).

The Court additionally notes that Plaintiff and Dumbuya swapped homes several years before the FWW was issued. (DeSio Dep. at 156:15–20).  Plaintiff testified that New Hope did not express dissatisfaction with her management of 102DD or 204MC before the FWW. (*Id.* at 157:7–24).  When asked how long he typically waits to issue a warning after a policy violation occurs, Dumbuya testified that a warning should be issued "[a]s soon as [he] can make both parties available." (Dumbuya Dep. at 48:25–29:9).  Dumbuya did not explain why he waited several years to raise his alleged concerns about Plaintiff's management of 102DD and 204MC. (*See id.* at 47:6–49:21).  Thus, the record raises a question of fact regarding the credibility of Dumbuya's assertion that Plaintiff's conduct with respect to 102DD and 204MC warranted discipline.

## 2. 307 Stupell Circle

The FWW alleged that Plaintiff failed to effectively oversee 307 Stupell Circle. (Docket No. 62-12 at 1). At his deposition, Dumbuya testified that he included this allegation in the FWW because he was informed by Seti that a DSP overheard Plaintiff making inappropriate comments during a meeting at 307SC. (Dumbuya Dep. at 114:18–10). However, the record demonstrates that Seti complained about Plaintiff's alleged inappropriate comments on August 29, 2018, several months after the FWW was issued. (Docket No. 59-11; Seti Dep.[16] at 33:17–34:11). Dumbuya confirmed during his deposition that the alleged comments were made in "2018, *after* [the final written] warning." (Dumbuya Dep. at 113:23–114:4; 115:9–12) (emphasis added). This chronology casts doubt on Dumbuya's alleged belief that Plaintiff's management of 307SC was an issue at the time he issued the FWW.

## 3. Plaintiff's Meeting Attendance

The FWW stated that Dumbuya met with Plaintiff "[o]n 2/14/18 . . . to discuss [her] lack of attendance to weekly residential coordinator's meeting [sic] and any other meetings that may need . . . attendance." (Docket No. 62-12 at 1). However, the record indicates that on February 14, 2018, Plaintiff was late to the RC meeting because of an ice storm that closed several roads near her home. (DeSio Dep. at 158:4–19). Plaintiff obtained a note from the Mamakiting highway department confirming the road closures. (*Id.* at 159:4–8). Plaintiff alleges that she attempted to provide Dumbuya with this note, but that he "gave it back and said he didn't need it." (*Id.* at 160:21–22). At his deposition, Dumbuya neither recalled meeting with Plaintiff about her attendance on February 14, 2018, nor did he recall an ice storm or Plaintiff presenting him with a note from the highway department. (Dumbuya Dep. at 89:24–91:15).

---

[16] Refers to the transcript of the deposition of Christina Seti taken on February 11, 2020. (Docket No. 69).

With respect to Plaintiff's attendance on other occasions, Plaintiff testified that although she was sometimes late, she only missed meetings when she was on vacation or out sick. (DeSio Dep. at 97:16–19).  By contrast, Anderson reported in early August 2018 that Plaintiff "attended 0 Team Meetings in 2018 [and] 0 CORE meetings in 2018." (Docket No. 59-7).  Accordingly, a dispute of material fact exists as to whether Plaintiff failed to attend meetings for which her attendance was required.

**4. Alleged Disclosure of Confidential Information to Edwards**

The FWW accused Plaintiff of telling Edwards "that she needs to learn how to complete paperwork" because Kehrley "will not be there long." (Docket No. 62-12 at 1).  Dumbuya alleged that Edwards told Duncan about this supposed conversation on June 14, 2018. (Dumbuya Dep. at 145:18–146:4).  However, Edwards testified that she told Plaintiff that she "was going to go for the Assistant House Manager position," which was held by Ketcham, not Kehrley, and that "at no point did [she and Plaintiff] discuss Nick Kehrley's demotion." (Edwards Dep. at 23:13–15; Edwards Aff. ¶ 4).  Plaintiff maintains that she did not tell Edwards about Kehrley's impending demotion. (DeSio Decl. ¶ 6).  Plaintiff also claims that upon receipt of the FWW, she asked Dumbuya to speak with Edwards to confirm her version of events, to which Dumbuya purportedly responded that "it wasn't [Edwards], but someone who had been next to her, that had reported that [Plaintiff] had told [Edwards] that [Kehrley] would be demoted." (*Id.* ¶ 7).  Thus, the record raises a factual dispute concerning Dumbuya's good faith reliance on Edwards' alleged complaint in issuing the FWW.

**5. May 29, 2018 Training**

The FWW alleged that Plaintiff acted unprofessionally at the May 29, 2018 training by crying in front of the staff, which was supposedly reported to Duncan on June 4, 2018. (Docket

No. 62-12 at 1).  However, Rion, Kehrley, Ketcham and Edwards, all of whom attended the

training, affirmed that they did not observe Plaintiff cry or act emotionally. (Ketcham Aff. ¶ 6,

Kehrley Aff. ¶ 8, Edwards Aff. ¶ 6; Rion Dep. at 57:7–8).

Further, Duncan testified that Dumbuya told him that Plaintiff cried at the training. (Duncan

Dep. at 135:5–21).  Dumbuya was not present at the training. (Dumbuya Dep. at 170:21–171:6).

When asked how he learned that Plaintiff had cried, Dumbuya stated that Duncan told him. (*Id.*

at 171:10–12).  Dumbuya testified that he was "sure [Edwards]" gave Duncan this information.

(*Id.* at 171:13–15).  Edwards, however, testified that she did not observe Plaintiff cry, nor did she

tell Duncan that Plaintiff cried. (Edwards Aff. ¶ 6).  Dumbuya's circular explanation regarding

from whom he heard that Plaintiff cried at the training, as well as Edwards, Kehrley, Ketcham

and Rion's testimony to the contrary, undermines the veracity of Dumbuya's belief that Plaintiff

acted inappropriately at the training.  Accordingly, a fact issue exists concerning Dumbuya's

credibility with respect to this allegation.

**6.  Alleged Complaints About Plaintiff**

The FWW alleged that "some managers" told Dumbuya that Plaintiff was not "effective

to their needs" and failed to assist them with scheduling. (Docket No. 62-12 at 1).  Dumbuya

claimed that Watkins, White, Martinez and Barnes came to him on separate occasions in June

2018 and complained that Plaintiff was "not helping with staffing." (Dumbuya Dep. at 218:19–

21, 219:20–21, 220:9–12, 221:13–15, 222:8–14, 223:1–7, 223:9–16).

By contrast, Barnes submitted an affidavit detailing her admiration for Plaintiff as an RC

and mentor. (Barnes Aff. ¶ 9).  Furthermore, Merritt-Smith testified that when an employee

levies a complaint against another employee, the complaint is "reported to human resources" and

"an investigation [is] conducted." (Merritt-Smith Dep. at 35:25–36:7).  None of the alleged

complaints were reported to human resources and no investigations were conducted. (*See* Dumbuya Dep. at 224:19–20).  However, the record includes several complaints made by Plaintiff's co-workers between August 1, 2018 — when Plaintiff returned to New Hope after her FMLA leave — and August 29, 2018 — nine days after her termination — all of which were recorded in writing and reported to human resources. (Docket Nos. 59-7–59-11).  The lack of contemporaneous documentation of the alleged June 2018 complaints may lead a jury to conclude that Dumbuya did not rely on these purported complaints in issuing the FWW. Moreover, the fact that complaints raised less than two months later were documented in accordance with company policy makes it even more peculiar that there is no concurrent documentation of the alleged June 2018 complaints. *Cf Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000) ("If [plaintiff's] performance had declined, as defendant insists, it seems surprising that there was no contemporaneous proof of that fact.").

### 7.  Compromised Safe at 410LW

The FWW alleged that on June 25, 2015, the safe at 410LW was compromised and Plaintiff failed to act for "several hours." (Docket No. 62-12 at 1).  Plaintiff testified that at approximately 4:00 p.m., Meekins informed her that Kehrley compromised the safe by leaving the combination in an unlocked drawer. (DeSio Decl. ¶ 7; *accord* DeSio Dep. at 169:8–16).  Plaintiff testified that she told Meekins to lock the valuables in a drawer to which only she had access. (DeSio Decl. ¶ 7; *accord* DeSio Dep. at 169:8–16).  Plaintiff called McPhillips and followed up by e-mail when he did not answer. (DeSio Decl. ¶ 9; DeSio Dep. at 170:15–19; Docket No. 62-15).  Dumbuya was copied on this e-mail. (Docket No. 62-15).

Dumbuya offers inconsistent explanations for Plaintiff's policy violations arising from the safe incident.  In the FWW, Dumbuya accused Plaintiff of waiting "several hours" after

learning about the safe to act. (Docket No. 62-12 at 1). Dumbuya later testified, however, that he did not care whether the safe was compromised for "one minute or five minutes," and that it was unacceptable that the safe was compromised at all. (Dumbuya Dep. at 207:9–17, 214:25–215:3). He averred that "in [his] role, if something comes to [him] . . . that means that . . . [Plaintiff] failed [her] responsibility . . . because it should not come to [him], it should be corrected." (*Id.* at 207:12–17, 214:7–22). Dumbuya went on to testify that even though Plaintiff took action to secure the valuables in the safe, she did not do so "in a timely fashion," violating New Hope policy. (*Id.* at 217:15–20). Dumbuya defined a "timely fashion" as: "one minute, two minutes, [or] three hours;" "it doesn't matter" because the problem was that the safe was compromised in the first place. (*Id.* at 217:24–218:6). Dumbuya's shifting explanation for Plaintiff's policy violation arising from the compromised safe calls into question the veracity of his basis for the FWW. *See Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 170 (2d Cir. 2001) ("a jury issue on the question of pretext may be created when an employer offers inconsistent and varying explanations for its decision to terminate a plaintiff."). In sum, Plaintiff has raised several factual disputes concerning Dumbuya's good faith belief that she violated a series of company policies warranting the FWW.

**b. Departure from Progressive Disciplinary Policy**

Plaintiff further argues that discriminatory animus is demonstrated by the "out-of-nowhere Final Written Warning." (Pl. Br. at 22). Plaintiff contends that Dumbuya "was unable to provide a credible explanation for why he jumped straight to a final warning when [her] last corrective action was in 2010" and New Hope follows a progressive disciplinary policy. (*Id.*). Although "[v]iolation of an organization's internal procedures alone is insufficient to create an inference of discrimination," failure to follow such "procedures can . . . evidence [] pretext."

*Petrovits v. New York City Trans. Auth.*, No. 95 CIV. 9872(DAB), 2002 WL 338369, at *8 (S.D.N.Y. Mar. 4, 2002) (internal quotation omitted).

Merritt-Smith, Dumbuya and Duncan testified that New Hope uses a progressive disciplinary policy, which begins with the issuance of a written warning 1, followed by a written warning 2, a final written warning and termination. (Merritt-Smith Dep. at 40:10–20; Dumbuya Dep. at 44:14–21; Duncan Dep. at 66:6–11). Dumbuya testified that before 2015, the progressive policy began with an oral warning, followed by a written warning, a final written warning and termination. (Dumbuya Dep. at 164:2–12; *see also* Merritt-Smith Dep. at 24:4–5).

Plaintiff has raised a question of fact as to whether Dumbuya followed New Hope's progressive disciplinary policy when issuing the FWW. Plaintiff's Employee Overview indicates that before the FWW, her last written warning was on November 24, 2010. (Docket No. 62-2 at 3). On June 27, 2018, Plaintiff received the FWW. (Docket No. 62-12 at 1). Dumbuya testified that he did not give Plaintiff a "written warning 2" because the 2010 written warning was issued before the disciplinary policy changed in 2015 and was thus the equivalent of a written warning 2. (Dumbuya Dep. at 164:5–12). This argument is premised on Defendants' contention that "verbal warnings to employees are not maintained in employee's personnel files." (Def. Br. at 9). Thus, Defendants maintain that because Plaintiff had a written warning in her file, she must have received an earlier oral warning, which was not recorded in her Employee Overview, and therefore, the 2010 written warning was the equivalent of a written warning 2. (*See id.*). Defendants therefore aver that a final written warning was an appropriate sanction for Plaintiff's alleged 2018 infractions. (*See id.*).

Defendants' assertion is belied by the record. Kehrley's Employee Overview demonstrates that New Hope recorded "oral warnings" given to Kehrley in 2000, 2006, 2008,

2012 and 2014. (Docket No. 62-13).  Indeed, Merritt-Smith testified that the company did not

stop recording oral warnings until 2018. (Merritt-Smith Dep. at 41:6–13).  Therefore, the record

does not indicate that Plaintiff's 2010 warning was the "equivalent" of a written warning 2.

Additionally, even assuming, *arguendo*, that the 2010 warning was the equivalent of a

written warning 2, Merritt-Smith testified that the timing of a previous written warning bears on

New Hope's decision to move to the next level of discipline. (*See id.* at 44:18–45:8).  She

testified that if, for example, an employee received a written warning 2 and "never ha[d] any

issues . . . and then four, five years [later] they do something . . . they may have an oral

[warning]." (*Id.* at 44:22–45:3).  Furthermore, Merritt-Smith and Singh both provided examples

of the "severe" conduct that warrants issuing an FWW where considerable time has elapsed since

an employee's last warning.  For instance, "punch[ing] an individual in the face" or an

employee's "involve[ment] in abuse," could result in immediate issuance of an FWW or

termination. (*Id.* at 43:11–12; Singh Dep. at 59:13–17).

Here, approximately eight years lapsed since Plaintiff's last warning. (*See* Docket No.

62-2).  Dumbuya testified that the FWW was nevertheless appropriate because of "everything

that happened at 410 Larry['s] Way." (Dumbuya Dep. at 99:2–15).  Even assuming that Plaintiff

behaved inappropriately with respect to the events at 410LW, these occurrences do not rise to the

level of severity contemplated by Merritt-Smith or Singh when describing the types of incidents

that warrant issuing an FWW absent a written warning 2 and where so much time has elapsed.

Finally, Merritt-Smith explained that it was her practice as Director of Human Resources

to proofread written warnings for, among other things, spelling and grammar. (Merritt-Smith

Dep. at 50:24–51:8).  Merritt-Smith claimed to have reviewed the FWW before it was issued to

Plaintiff. (*Id.* at 105:16–18).  However, the FWW is rife with spelling and grammar errors, which

may lead a fact finder to infer that Merritt-Smith did not proofread the FWW. (*See* Docket No. 62-12 at 1).

In sum, Plaintiff has demonstrated that a reasonable jury may find that the reasons offered by Dumbuya for the FWW were not credible. Furthermore, since the FWW placed Plaintiff on a performance improvement plan, the purported violation of which was the direct cause of her termination, a finding that the FWW was pretextual may lead a jury to conclude that the stated reasons for Plaintiff's termination were also pretextual.

**ii. Sufficiency of Evidence to Sustain a Verdict for Plaintiff**

"[T]he test for summary judgment is whether the evidence can reasonably support a verdict in plaintiff's favor." *James v. New York Racing Ass'n*, 233 F.3d 149, 157 (2d Cir. 2000). Thus, that plaintiff has established a *prima facie* showing and set forth evidence rejecting the employer's explanation "will [not] *always* be adequate to sustain a jury's finding of liability." *Reeves*, 530 U.S. at 148 (emphasis in original). Proof that "the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessary establish that" the real reason for the action was discrimination. *Id.* at 146–47. Put another way, it is not enough to produce evidence that may allow a reasonable fact finder to disbelieve the employer; the evidence must support a finding that the employer intentionally discriminated against the Plaintiff. *See id.*; *see, e.g.*, *James*, 233 F.3d at 157 (affirming summary judgment for employer where plaintiff "satisfied the minimal *McDonnell Douglas* standard for a prima facie case and offered evidence that arguably would allow a reasonable factfinder to conclude that [the employer's] explanation . . . [was] false," but failed to adduce sufficient evidence to "permit a reasonable trier of fact to find that [] discrimination was the reason for his discharge . . ."). Thus, the Court must determine "whether the evidence, taken as a whole, is sufficient to support a reasonable

inference" that discrimination or retaliation occurred. *Zakre v. Noddeutsche Landesbank Girozentrale*, 396 F. Supp. 2d 483, 509 (S.D.N.Y. 2005).

### a. Disability-Based Discrimination Claims

For Plaintiff's ADA and NYSHRL claims to survive summary judgment, Plaintiff must establish that disability-based discrimination was the "but-for" cause of the FWW and her termination. *See Natofsky*, 921 F.3d at 348. While Plaintiff "retains the ultimate burden of persuasion, . . . summary judgment is appropriate only if the employer's nondiscriminatory reason is dispositive and forecloses any issue of material fact." *Clark*, 96 F. Supp. 3d at 249 (alterations and internal quotation omitted). Defendants argue that Plaintiff failed to adduce sufficient evidence for a jury to conclude that her disabilities were the but-for cause of the FWW and her termination. (Def. Br. at 23–24). Defendants characterize Plaintiff's arguments concerning the veracity of Dumbuya's stated reasons for the FWW as mere disagreement with her "negative performance evaluation." (*Id.*; Def. Reply at 9–10).

The Court finds that Plaintiff has created an issue of fact regarding whether the FWW and Plaintiff's subsequent termination were because of her disability. In reaching this conclusion, the Court considers: (1) Dumbuya's repeated comments that Plaintiff needed to "speed" up, which allegedly occurred soon after she presented him with the note from Dr. Bahana about her disability and shortly before she received the FWW; (2) evidence demonstrating that Dumbuya's reasons for the FWW were pretextual; and (3) conflicts in the evidence regarding whether Dumbuya followed New Hope's progressive disciplinary policy in issuing the FWW. Accordingly, Defendants' motion for summary judgment as to Plaintiff's disability-based discrimination claims under the ADA and the NYSHRL is denied.

**b. FMLA Retaliation Claim**

For her FMLA retaliation claim to survive summary judgment, Plaintiff must demonstrate that her exercise of FMLA rights was a negative factor in New Hope's decision to issue the FWW and/or terminate her. *See Ziccarelli*, 2021 WL 797668, at *6 (quoting *Woods*, 864 F.3d at 169). The record indicates that on April 19, 2018, Plaintiff submitted a note from her mother's doctor to New Hope, requesting that Plaintiff be available two days per week to care for her mother. (*See* DeSio Dep. at 84:10–85:3–8). Plaintiff alleges that thereafter, Dumbuya called her into his office to ask "why [she] was taking FMLA" when she "ha[d] plenty of sick time." (*Id.* at 99:22–100:22). Dumbuya purportedly continued to question Plaintiff about her need to take FMLA leave and "rolled his eyes at [Plaintiff] before [she] left the office." (*Id.* at 100:24–101:20). Plaintiff recounted the substance of this conversation in a July 12, 2018 e-mail to human resources. (Docket No. 62-14 at 10). Dumbuya neither recalls whether he and Plaintiff had such a conversation, nor whether he was aware of Plaintiff's mother's health issues. (Dumbuya Dep. at 83:17–85:14). The FWW was issued on June 27, 2018, approximately two months after this alleged conversation took place. (Docket No. 62-12 at 1). Plaintiff again requested FMLA leave on July 1, 2018, which she returned from on August 2, 2018. (Def. 56.1 ¶ 8). Shortly thereafter, Plaintiff was terminated on August 20, 2018. (Docket No. 62-20).

The Court finds that material issues of fact exist concerning whether Plaintiff's exercise of rights under the FMLA was a negative factor in the adverse actions taken against her. Defendants argue that Plaintiff's FMLA retaliation claim is undermined by the fact that Plaintiff successfully took several other FMLA leaves throughout her tenure at New Hope. (Def. Br. at 30). Plaintiff took two FMLA leaves in 2000 to recover from gallbladder and gastric bypass surgeries, as well as intermittent FMLA leave in 2009 and 2013 to care for her parents. (DeSio

Dep. at 98:24–99:3, 99:5–10).  Although the record indicates that Plaintiff returned from these

FMLA leaves without issue, significant time elapsed between these FMLA leaves and the ones at

issue in the present case.  Indeed, Plaintiff's exercise of FMLA rights at issue here occurred in

2018.  Dumbuya did not become Plaintiff's supervisor until approximately July 2017. (Dumbuya

Dep. at 18:22–24).  Thus, the fact that Plaintiff took previous FMLA leaves without issue does

not foreclose the inference that her 2018 leaves were a negative factor motivating Dumbuya to

issue the FWW and her subsequent termination.

Furthermore, the present case is distinguishable from *Di Giovanna*, to which Defendants

cite for the proposition that it "defies credulity that New Hope, which granted Plaintiff numerous

FMLA leaves . . . suddenly developed discriminatory animus toward her in 2018." (Def. Br. at

29).  In *Di Giovanna*, the plaintiff took 27 days of sick and/or vacation leave between November

2006 and May 2007. 651 F. Supp. 2d at 197.  Plaintiff testified that he remained gainfully

employed despite taking this time off. *See id.*  Thereafter, in May 2007, Plaintiff was granted

intermittent FMLA leave. *Id.*  Plaintiff was terminated in October 2007, ostensibly for his poor

work performance. *Id.*  Although plaintiff had the same supervisors at all relevant times, he

argued that his termination was motivated by his May 2007 leave. *Id.* at 197–98.  However,

plaintiff only took 7 days off during the six-month period between his May 2007 request for

intermittent FMLA leave and his termination. *Id.* at 207–08.

The Court rejected plaintiff's argument that despite having no problem with his taking

*twenty-seven* days off in the six-month period from November 2006 to May 2007, plaintiff's

supervisors then decided to punish him for taking *seven* days off in the six-month period

commencing in May 2007. *See id.*  Moreover, the plaintiff in *Di Giovanna* alleged that his

supervisor's purported "campaign" to retaliate against him for taking FMLA leave commenced

on June 26, 2007, at which time he had only taken *one* day of FMLA leave. *Id.* at 208.

Accordingly, the circumstances presented in *Di Giovanna* are distinguishable from the instant

case.  Here, Plaintiffs' previous FMLA leaves occurred between five and eighteen years earlier

than the ones presently at issue and occurred before Dumbuya became Plaintiff's supervisor.

Defendants also argue that other New Hope employees — including five of seven RCs —

successfully returned from FMLA leave at some point during their tenure. (Def. 56.1 ¶¶ 47–48).

A jury may find the fact that the majority of New Hope's RCs successfully returned from FMLA

leave to be persuasive evidence that the adverse actions taken against Plaintiff were not

retaliatory.  However, this does not entitle Defendants to summary judgment.  It is not the role of

the Court on summary judgment to weigh the evidence or to determine the truth of the matter,

but to "determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249.

In sum, Dumbuya's alleged April 2018 "question[ing]" of Plaintiff's FMLA leave and

the timing of the adverse employment actions taken against Plaintiff raise a material issue of fact

regarding whether Plaintiffs' exercise of FMLA rights were a negative factor in New Hope's

decision-making with respect to the FWW and/or her termination.  Accordingly, Defendants'

motion for summary judgment is denied with respect to Plaintiff's FMLA retaliation claim.

### c.  Intersectional Discrimination

Plaintiff asserts an intersectional discrimination claim on the basis of her age, disability

and FMLA leaves. (Pl. Br. at 21).  In essence, Plaintiff asks the Court to determine whether she

is entitled to relief in her capacity as an older, disabled individual who exercised FMLA rights.

(*See id.*).  Plaintiff has not provided, and the Court has not located, any precedent where a federal

court recognized a claim at the intersection of age-based discrimination, disability-based

discrimination, and FMLA retaliation.  Nevertheless, the Court does not need to decide whether

such a claim exists because it has already determined that Plaintiff adduced enough evidence of age-based discrimination and FMLA retaliation to send this case to a jury. *See Gorzynski*, 596 F. 3d at 110 (declining to create an age-plus-sex claim independent of plaintiff's viable ADEA claim).

**B.  Plaintiff's Hostile Work Environment Claims Under the ADA and NYSHRL**

Defendants seek to dismiss Plaintiff's complaint in its entirety, but do not address Plaintiff's allegation that she was subject to a hostile work environment based on her disability in their brief. (*See generally* Def. Br.; Def. Reply).  Nor does Plaintiff argue that she endured a hostile work environment in her brief opposing summary judgment. (*See generally* Pl. Br.). Plaintiff merely states, in the context of her pretext argument, that "the hostile work environment that Dumbuya created through the Final Written Warning" "foreseeably caused" Plaintiff to make the "fatalistic" comment that her days at New Hope were numbered. (Pl. Br. at 28). "Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." *Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 645 (S.D.N.Y. 2015) (internal quotation omitted).  However, Defendants do not address Plaintiff's hostile work environment claim in their brief.  Therefore, the Court cannot deem the claim abandoned.  The Court will briefly discuss Plaintiff's hostile work environment claim, which it concludes lacks merit.

Hostile work environment claims under the ADA are analyzed under the same standards as such claims brought under the NYSHRL. *Monterroso v. Sullivan & Cromwell, LLP*, 591 F. Supp. 2d 567, 584 (S.D.N.Y. 2008); *Massie v. Metro. Museum of Art*, No. 11-CV-9549 (JPO), 2015 WL 3833839, at *6 (S.D.N.Y. June 22, 2015).  To withstand summary judgment, Plaintiff must point to evidence in the record indicating that her "workplace is permeated with

discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Littlejohn v. City of N.Y.*, 795 F.3d 297, 320-21 (2d Cir. 2015) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).  Specifically, Plaintiff must adduce evidence that the complained of conduct "(1) is objectively severe or pervasive — that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [disabilities]." *Figueroa v. Johnson*, 109 F. Supp. 3d 532, 552-53 (E.D.N.Y. 2015) (quoting *Bowen-Hooks v. City of N.Y.*, 13 F. Supp. 3d 179, 233 (E.D.N.Y. 2014)).  Plaintiff must also establish a specific basis for imputing the hostile work environment to New Hope. *See Lamarr-Arruz v. CVS Pharmacy, Inc.*, 271 F. Supp. 3d 646, 658-59 (S.D.N.Y. 2017).

"Whether the challenged conduct is sufficiently severe or pervasive 'depends on the totality of the circumstances.'" *Aulicino v. N.Y.C. Dep't of Homeless Servs.*, 580 F.3d 73, 82 (2d Cir. 2009) (quoting *Harris*, 510 U.S. at 114).  In *Harris*, the Supreme Court established a non-exclusive list of factors to consider, including but not limited to: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." 510 U.S. at 23.  The frequency and the severity of the misconduct are the principal focus of the analysis; the last three factors are specific considerations within the severity inquiry. *Aulicino*, 580 F.3d at 82.

The Court assumes for purposes of the instant discussion that Plaintiff subjectively perceived her working environment as hostile.  Nevertheless, Plaintiff has not adduced any evidence that could lead a reasonable fact finder to conclude that her work environment was

objectively hostile.  Plaintiff ostensibly argues that New Hope became a hostile work

environment after she received the FWW. (*See* Pl. Br. at 28).  Furthermore, Plaintiff testified that

Dumbuya was "rude" to her and that he and Singh would ignore her, which was confirmed by

Barnes. (DeSio Dep. at 130:16–18, 131:8–19; Barnes Aff. ¶ 4).  The Court also considers

Dumbuya's alleged comment that Plaintiff "need[ed] to speed up" and query as to why she did

not move as quickly as other employees. (DeSio Dep. at 131:2–3).  Nevertheless, the issuance of

the FWW and Dumbuya's alleged comments and rudeness, even if motivated by Plaintiff's

disabilities, neither created a workplace that was "permeated with discriminatory intimidation,

ridicule, and insult," nor did they alter the terms and conditions of Plaintiff's employment. *See*

*Littlejohn*, 795 F.3d at 320–21; *see also Lyon v. Jones*, 260 F. Supp. 2d 507, 513 (D. Conn.

2003) (written reprimand combined with three other incidents of alleged harassment were

insufficiently severe or pervasive to demonstrate an objectively hostile work environment).

Accordingly, the Court finds that Defendants are entitled to summary judgment with respect to

Plaintiff's hostile work environment claim.

## C.  Plaintiff's NYSHRL Retaliation and ADA Failure to Provide a Reasonable Accommodation Claims

Plaintiff's complaint summarily alleges that she was retaliated against for seeking to

exercise rights protected by the NYSHRL. (Complaint ¶ 76).  Plaintiff ostensibly argues that she

was retaliated against for her July 12, 2018 e-mail to human resources, in which she stated that

she believed she was "being targeted due to [her] medical condition," requesting an

accommodation in December 2017, and requesting FMLA leave. (Docket No. 62-14 at 10).  The

Complaint also alleges that New Hope failed to provide Plaintiff with a reasonable

accommodation. (Complaint ¶ 43(c)).

However, unlike Plaintiff's hostile work environment claim, Plaintiff does not mention retaliation or failure to provide a reasonable accommodation in her opposition to summary judgment, despite the fact that Defendants devote portions of their brief to both of these claims. (*See generally* Pl. Br.; *see also* Def. Br. at 24–26, 30–31; Def. Reply at 10–11).  As discussed *supra*, "when a party moves for summary judgment on one [claim] and the party opposing summary judgment fails to address the argument in any way," a court may determine that such a claim is abandoned. *Rockland Exposition, Inc. v. All. of Auto. Serv. Providers of New Jersey*, 894 F. Supp. 2d 288, 331 (S.D.N.Y. 2012) (collecting cases) (quoting *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)).  Accordingly, the Court finds that Plaintiff has abandoned her retaliation and failure to accommodate claims by not discussing them in her opposition brief, despite Defendants' arguments for their dismissal. *See, e.g.*, *Avola v. Louisiana-Pac. Corp.*, 991 F. Supp. 2d 381, 390 (E.D.N.Y. 2013) ("failure to acknowledge, let alone address, the remaining . . . claims in opposing the Motion signals the abandonment of these claims") (collecting cases).

### D. NYSHRL Disability-Discrimination Claim Against Dumbuya

The Complaint also brings claims against Dumbuya in his individual capacity pursuant to the NYSHRL, which provides that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this article, or to attempt to do so." N.Y. Exec. L. § 296(6).  Defendants correctly assert that a finding of liability against New Hope is a necessary prerequisite to holding Dumbuya liable under the NYSHRL. (Def. Br. at 31; Def Reply at 13).  Since the Court finds that Plaintiff's NYSHRL disability discrimination claim must be resolved by a jury, *see supra* Section III(A)(5)(ii)(a), Plaintiff's claim against Dumbuya for aiding and abetting disability-based discrimination under the NYSHRL cannot be dismissed on summary judgment.

IV.  CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.  Plaintiff's age-based discrimination claims under the ADEA and NYSHRL, hostile work environment claims under the ADA and NYSHRL, failure to accommodate claim under the ADA, and NYSHRL retaliation claim are dismissed.  The following claims remain: (1) Plaintiff's ADA and NYSHRL disability-based discrimination claims against New Hope; (2) Plaintiff's FMLA retaliation claim against New Hope; and (3) Plaintiff's claim against Dumbuya for aiding and abetting disability-based discrimination under the NYSHRL.

The Clerk is respectfully requested to terminate the pending motion (Docket No. 57).

Dated:    September 28, 2021
          White Plains, New York

SO ORDERED:

JUDITH C. McCARTHY
United States Magistrate Judge